# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TWIN STATE RAILROAD CORPORATION | ) |
| Plaintiff | ) |
| | ) |
| v. | ) C.A. No. 04-12292-JLT |
| | ) |
| MAINE CENTRAL RAILROAD COMPANY | ) |
| Defendant | ) |
| | ) |

## MEMORANDUM OF REASONS IN SUPPORT OF MOTION TO DISMISS COMPLAINT

Defendant, Maine Central Railroad Company ("MEC") submits this memorandum in support of its Motion to Dismiss pursuant to Rules 7(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and Rule 7.1 of the Rules of this Court. As described in this memorandum, the Court should allow Defendant's Motion and dismiss the Complaint because Plaintiff, Twin State Railroad Company ("TSR") fails to state a cause of action upon which relief may be granted.

## I.    FACTUAL BACKGROUND

The subject of the Complaint is a lease and operating agreement that MEC entered into with the Lamoille Valley Railroad Company ("LVRC") and its designee, Plaintiff, TSR, on March 1, 1984 (the "Lease"). The Lease is attached hereto as Exhibit "A." TSR and MEC are common carriers by rail and are therefore subject to the

jurisdiction of the United States Surface Transportation Board ("STB"). 49 U.S.C. § 10501(a).

On October 28, 1981, Guilford Transportation Industries, Inc ("GTI"), a non-carrier who controls[1] MEC, sought authority from the Interstate Commerce Commission ("ICC") (predecessor to the STB), pursuant to 49 U.S.C. § 11343 (1978),[2] to acquire control of the Boston and Maine Corporation ("B&M"), also a common carrier by rail. *See Guilford Transportation Industries, Inc. – Control – Boston and Maine Corporation*, 366 I.C.C 294 (1982) ("*Guilford I*"). The acquisition of B&M would create an "end-to-end rail system that connected MEC points in Maine with B&M's western gateways at Mechanicville and Rotterdam Junction, NY." *Id.* at 318.

At the time of GTI's application, LVRC operated[3] a single 98-mile east-west line between Swanton and St. Johnsbury, Vermont, which supported overhead traffic from MEC at St. Johnsbury to the Canadian National Railway Corporation at Swanton, or vice-versa, as well as limited traffic that originated or terminated on the line. *Lamoille Valley Railroad Company v. Interstate Commerce Commission*, 711 F.2d 295, 303 (D.C. Cir. 1983). The acquisition of B&M presented the potential diversion of MEC traffic

---

[1] 49 U.S.C. § 10102 defines "control" as "when referring to a relationship between persons, includes actual control, legal control, and the power to exercise control, through or by (A) common directors, officers, stockholders, a voting trust, or a holding or investment company, or (B) any other means ..."
[2] 49 U.S.C. § 11343 (1978) provided that any transaction, which involved the acquisition of control of a carrier by a non-carrier that already controls another carrier, may only be carried out with the approval and authorization of the ICC. *See Lamoille Valley Railroad Company v. Interstate Commerce Commission*, 711 F.2d 295, n.2 (D.C. Cir. 1983). On January 1, 1996, the Interstate Commerce Commission Termination Act of 1995 became effective and, as a result, 49 U.S.C § 11343 was amended and re-codified at 49 U.S.C. § 11323. *See* Pub L. 104-88, § 102(a).
[3] The State of Vermont (the "State") owned the line from St. Johnsbury, Vermont to Swanton, Vermont. The State through its Agency of Transportation ("VTrans") purchased this line from Lamoille Valley Railroad, Inc. on or about April 22, 1974. *See* Finance Docket No. 27594, Lamoille County Railroad, Inc. and Vermont Transportation Authority, Acquisition and Operation Between St. Johnsbury and Swanton, VT and Finance Docket No. 27587, Lamoille County Railroad, Inc., Stock (ICC served April 22, 1974). LVRC held a leasehold interest in this Line pursuant to a Lease Agreement between LVRC and the State of Vermont dated December 31, 1977.

2

from the LVRC line to B&M lines, which also run east-to-west. *Id.* LVRC did not oppose the acquisition of B&M. However, LVRC argued that the ICC should impose a protective condition on the transaction in the form of a requirement that B&M sell a portion of its line to LVRC so that LVRC would have a substitute source of income in the event there was a significant diversion of traffic to B&M. *Id.* at 304. The ICC approved GTI's application without protective conditions. *Guilford I* at 349.

LVRC appealed the decision of the ICC to the District of Columbia Circuit of the United State Court of Appeals arguing that the test used by the ICC to determine whether protective conditions should have been imposed was "too strict and [did] not comply with the statutory directive that the ICC consider the effect of the [transaction] on 'adequacy of transportation to the public.'" *Lamoille Valley Railroad Company* 711 F.2d at 300 *citing* 49 U.S.C. § 11344(b)(1) (1978)[4]. The Court found that the test employed by the ICC, *as applied to LVRC*, was too strict and remanded to the ICC to reevaluate the implementation of protective conditions. *Id.* at 305 (emphasis added in decision).

In order to prevent further litigation, GTI, MEC, the State and LVRC entered into a Settlement Agreement on November 1, 1983 (the "Settlement Agreement"). The Settlement Agreement is attached hereto as Exhibit "B." The Settlement Agreement provided that MEC and LVRC would enter into an Operating Agreement pursuant to which LVRC would operate MEC's line of railroad between Whitefield, New Hampshire and St. Johnsbury, Vermont (the "Line"). The Settlement Agreement outlines several terms and conditions that were required to be incorporated into the Operating Agreement,

---

[4] As the owner of the line from St. Johnsbury to Swanton, Vermont, the State of Vermont intervened in the appeal to the District of Columbia Circuit.

including MEC's continued right to provide service on the Line and LVRC's obligation to maintain the Line.

Pursuant to the terms of the Settlement Agreement, MEC entered into the Lease with LVRC and, its designee, TSR, which was organized as an affiliate of LVRC for the sole purpose of operating the Line. *See Maine Central Railroad Company, State of New Hampshire – Adverse Discontinuance – Line between Whitefield, NH and St. Johnsbury, VT*, STB Docket No. AB-848 (Served July 1, 2003), p.4, n.3. The Lease was approved by the ICC pursuant to 49 U.S.C. § 11343(a)(2) (1978) on May 16, 1984. *Guilford Transportation Industries, Inc. – Control – Boston and Maine Corporation*, Finance Docket No. 29720 (Sub-No. 1); *Guilford Transportation Industries, Inc. – Control – Delaware and Hudson Railway Corporation*, Finance Docket No. 29772 (ICC decided May 22, 1984) ("*Guilford II*"). The Lease conveys to TSR a leasehold interest in the Line and the right to operate on the Line. MEC retained its fee simple interest in the Line and its common carrier rights and obligations.

MEC sold the eastern portion of the Line, from Whitefield, New Hampshire to Gilman, Vermont (the "Eastern Segment"), to the State of New Hampshire, Department of Transportation in December of 2002. The sale of the Eastern Segment was made subject to the Lease. *State of New Hampshire, Department of Transportation – Acquisition and Operation Exemption – Certain Assets of Maine Central Railroad Company*, STB Finance Docket No. 34307 (STB served Jan. 22, 2003). MEC retained ownership of the western portion of the Line from Gilman to St. Johnsbury, Vermont (the "Western Segment").

## II.    ARGUMENT

## PLAINTIFF'S COMPLAINT DOES NOT STATE A CAUSE OF ACTION UPON WHICH RELIEF MAY BE GRANTED

A motion to dismiss, pursuant to Rule 12(b)(6), is appropriate when the pleading shows no set of facts which could entitle a plaintiff to relief. *Gooley v. Mobil Oil Corporation*, 851 F.2d 513, 515 (1st Cir. 1988). There is no set of facts TSR can allege that will allow its claim to advance, therefore, MEC should prevail.

**A.    The Complaint alleges state law claims that are preempted by the Interstate Commerce Act ("ICA").**

**1.    The ICA preempts the state remedies sought by TSR.**

The ICA gives the STB exclusive jurisdiction over all aspects of rail transportation, including the "construction, acquisition, operation, *abandonment or discontinuance*" of rail lines. 49 U.S.C. § 10501(b) (emphasis added). Section 10501(b) also decrees that "[e]xcept as otherwise provided in this part,[6] the *remedies provided under this part* with respect to the regulation of rail transportation are *exclusive* and *preempt* the *remedies* provided under Federal or *State law*." *Id.* (emphasis added).[7]

---

[6] "[T]his part" is part A (Rail) of subtitle IV (Interstate Transportation) of title 49 of the U.S. Code. *See* 109 Stat. 804-05. Part A comprises sections 10101 through 11908 of title 49.

[7] The full text of section 10501(b) reads:

"(b)    The jurisdiction of the Board over—

(1)    transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2)    the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law."

"As such, [it is clear that the] purpose of Congress when it enacted the [ICA, as broadened by the] ICCTA was to place certain areas of railroad regulation within the exclusive jurisdiction of the STB and to preempt remedies otherwise provided under federal or state law." *Rushing v. Kansas City Southern Railway Company*, 194 F.Supp.2d 493, 498 (S.D. Miss. 2001). The jurisdiction of the STB over the transportation of rail carriers and the remedies provided under 49 U.S.C. §§ 10101 – 11908 are exclusive and preempt all other remedies provided under state law, including those sought by TSR. *City of Lincoln – Petition for Declaratory Order*, STB Finance Docket No. 34425 (Decided August 11, 2004), pg. 3 *citing City of Auburn v. Surface Transportation Board*, 154 F.3d 1025, 1029-31 (9th Cir. 1998), *cert. denied*, 527 U.S. 1022 (1999) ("*City of Auburn*").

As demonstrated below, the ICA provides a remedy with respect to the claim at issue here. Also as demonstrated below, the ICA does not provide an alternative remedy for this situation. Therefore, TSR's state law claim is preempted by section 10501(b) and TSR is limited to the remedy provided for under 49 U.S.C. § 10903.[8]

Federal law "shall be the supreme Law of the Land; . . . any Thing in the Constitution or the Laws of any state to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. There are three types of preemption pursuant to the Supremacy Clause—(1) express preemption, where the intent of Congress is explicitly stated in the language of a statute or implicitly contained in its structure and purpose; (2) conflict preemption, where the state law in question conflicts with the federal law; and (3) field preemption, where federal law so thoroughly occupies the field as to leave no room for the states to

---

[8] Preemption is appropriately raised by motion to dismiss. *Sturm, Ruger Co., Inc. v. Connecticut Gen. Life Ins. Co.*, 1994 WL 258313 (D.N.H. 1994); *Lawal v. British Airways, PLC*, 812 F. Supp. 713, 721 (S.D. Tex. 1992).

supplement it.   *Cippollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) ("*Cippolone*").  Any given situation may involve more than one type of preemption, *see Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n. 6 (2000), and the case at bar involves both express and field preemption.  And where, as here, the express preemptive language of the federal statute is broad and makes no distinction between positive state enactments and common law, state common law remedies also are preempted.  *Levesque v. Miles, Inc.*, 816 F. Supp. 61, 67 (D.N.H. 1993) (citing *Cippollone*).

In section 10501(b), Congress has "explicitly stated" its intent to preempt state law remedies that touch upon or concern "transportation by rail carriers."  *Pejepscot Industrial Park, Inc. v. Maine Central R.R. Co.*, 215 F.3d 195, 202 (1st Cir. 2000) ("*Pejepscot*").  "The last sentence of § 10501(b) plainly preempts state law."  *Id.*; *accord City of Auburn*, 154 F.3d at 1028-30; *Burlington N. Santa Fe Corp. v. Anderson*, 959 F. Supp. 1288, 1295 (D. Mont. 1997); *CSX Transp., Inc. v. Georgia Public Service Comm'n*, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996) (noting extraordinary breadth of § 10501(b)); *Burlington N. R.R. Co. v. Page Grain Co.*, 545 N.W.2d 749 (Neb. 1996).  This is consistent with longstanding federal preemption of the field of rail transportation, leaving no room for state causes of action.  *See Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981) ("*Kalo Brick*"); *Modin v. New York Central Co.*, 650 F.2d 829, 834-35 (6th Cir. 1981) (ICA preemption of damage claim under state insurance law).  Moreover, even those aspects of rail transportation that are not affirmatively regulated by the STB remain subject to the preemptive effect of section 10501(b), *Alliance Shippers, Inc. v. S. Pac. Transp. Co.*, 858 F.2d 567 (9th Cir. 1988); *G&T Terminal Packaging Co. v. Consolidated Rail Corporation*, 830 F.2d 1230, 1233-

8

35 (3rd Cir. 1987); *Consolidated Rail Corporation - Declaratory Order - Exemption*, 1 I.C.C.2d 895 (1986).

    2.    **TSR's state law remedies are preempted until the Western Segment is abandoned.**

    TSR seeks a declaratory order to determine which party may salvage and sell the Rail Assets, in essence asking this Court to interpret a contract that exists in one form under state law. However, the remedy sought by TSR—treating the Lease as a state law contract and applying state law principles to declare that it can perform this salvaging--is preempted or, at the very least, premature because the Western Segment is still subject to STB jurisdiction and a remedy under the ICA exists.

    If TSR were to succeed in this case and be allowed to salvage the Rail Assets prior to the STB's grant of abandonment authority, disabling MEC's ability to provide rail service, MEC would be prevented from complying with federal law and meeting its common carrier obligation[9] resulting in an illegal de facto abandonment. *Modern Handcraft, Inc. – Abandonment in Jackson County, MO*, ICC Finance Docket No. 29330 (ICC Decided August 19, 1981), pg. 2 ("*Modern Handcraft*"). Since the remedy sought by TSR would effectively abandon the Western Segment, a remedy within the exclusive and plenary jurisdiction of the STB, the cause of action is preempted.

    Neither TSR nor MEC have received abandonment authority from the STB, therefore, the Western Segment must remain intact and the salvage and sale of the assets cannot occur until the interests of both parties have been abandoned under 49 U.S.C. § 10903. "Only after abandonment is authorized and exercised would anyone be free to salvage the rail, ties and physical assets in what had been [the] rail line." *SF&L Railway,*

---

[9] *See generally* 49 U.S.C. §§ 10101, 10742, 11101, 11121, and 11122.

*Inc. – Acquisition and Operation Exemption – Toledo Peoria and Western Railway Corporation Between La Harpe and Peoria, IL,* STB Finance Docket No. 33995; *Kern W. Schumacher and Morris H. Kulmer – Continuance in Control Exemption – SF&L Railway, Inc.,* STB Finance Docket No. 33996; *SF&L Railway, Inc. – Abandonment Exemption – In Hancock, McDonough, Fulton and Peoria Counties, IL,* STB Docket No. AB 448 (Sub No. 2X); *Western Illinois Railway Company – Acquisition Exemption – Toledo, Peoria and Western Railway Corporation,* STB Finance Docket No. 34282 (Decided February 6, 2003) ("*SF&L Railway*"). The ICA provides TSR's only remedies at this point because, until the Western Segment is abandoned, it remains under the jurisdiction of the STB and subject to preemption pursuant to 10501(b). Section 10903 provides that "[a]ny rail carrier providing transportation subject to the jurisdiction of the STB may abandon any part of its railroad lines if the STB finds that the present or future public convenience and necessity require or permit the abandonment. 49 U.S.C. § 10903(d)(1995). The authority granted to the STB under section 10903 is exclusive and plenary. *Kalo Brick* at 320. The STB's authorization of abandonment brings its regulatory mission to an end and allows for the pursuit of state law causes of action. *Hayfield Northern Railroad Company, Inc. v. Chicago and Northwestern Transportation Company,* 467 U.S. 622, 633-34, 104 S.Ct. 2610 (1984) ("*Hayfield*").

The owner of a rail line subject to the regulatory authority of the STB assumes a common carrier obligation that continues until that obligation is extinguished through the exercise of abandonment and/or discontinuance authority under section 10903. *SF&L Railway* at 3. *See also Hayfield* at 628. The owner of a rail line, similar to any other property owner, may lease the line to another carrier—though any such lease is without

force and effect absent STB approval and authorization under 49 U.S.C. § 11323. Upon such STB approval, the lessee assumes a common carrier obligation on the line. Similar to the owner of the rail line, the lessee cannot relieve itself of its common carrier obligation without STB approval, although in the instance of a lease, discontinuance of service is the proper remedy. Complaint ¶ 9.

There is an important distinction between the abandonment of a rail line and the discontinuance of service. *Preseault v. Interstate Commerce Commission*, 110 U.S. 1, 6, n.3, 110 S.Ct. 914 (1990). Once a carrier abandons a rail line pursuant to authority granted by the STB, the line is no longer a part of the national transportation system. *Id.* In contrast, the authority to discontinue a rail line allows a railroad to cease operating a line for an indefinite period of time while preserving the rail corridor for possible reactivation of service in the future. [10] *Id.*

Importantly, for the purposes of this action, the carrier who owns a line does not relieve itself of its common carrier obligation simply by leasing a rail line to another carrier. *Wisconsin Central Ltd. v. Surface Transportation Board*, 112 F.3d 881, 888 (7th Cir. 1996) ("*Wisconsin Central*") ("Rather, once the lessee ceases operations, the duty to provide service reverts to the lessor and remains with it unless and until the [STB] grants permission to abandon the line.") *citing Meyers v. Famous Realty, Inc.*, 271 F.2d 811, 814 (2nd Cir. 1959) ("*Meyers*"). *See also ISTRA Corporation – Lease and Operation Exemption -- Central of Georgia Railroad Company*, STB Finance Docket No. 31449 (Decided May 18, 1989), pg. 2, n. 2 (Lessor retains a residual common carrier obligation

---

[10] Abandonment and discontinuance are also different from an embargo. "An embargo is an emergency measure placed in effect because of some disability on the part of the carrier which makes the latter unable properly to perform its duty as a common carrier." *Railroad Ventures v. Surface Transportation Board*, 299 F.3d 523, 534, n. 5 (6th Cir. 2002).

to resume operations should Lessee curtail operations). Also important for the purposes of this action, neither abandonment nor discontinuance authority is effective until abandonment and/or discontinuance authority has been granted and all conditions imposed by the STB have been satisfied and the carrier seeking such authority has consummated the transaction. *Maine Central RR Co.—Abandonment Exemption—In Androscoggin Cty, ME*, STB Docket No. AB-83 (Sub-No. 16X), (STB Served September 14, 2000) ("*State of Maine*"); 49 C.F.R. § 1152.29(e). Accordingly, the Western Segment continues to be subject to STB jurisdiction on at least two levels. First, TSR has not met the conditions imposed by the STB and therefore cannot consummate the abandonment and discontinuance authority. *See Twin State* at 2. Second, MEC, as the owner of the Western Segment with a residual common carrier obligation, has not received—or even sought—abandonment and discontinuance authority from the STB. Reply at 3-4.

Additionally, the Lease clearly demonstrates that MEC had no intent to convey ownership in the Western Segment or its common carrier rights and obligations to TSR or anyone else, nor has MEC evidenced any such intent throughout the term of the Lease. Reply at 2. Specifically, the Lease is clear that it was the intent of both parties that MEC retain its ownership interest and common carrier rights and obligations in the Western Segment. For example, Section 1.02 of the Lease reserves to MEC the exclusive rights, "...to convey the fee interest in any real estate property constituting part of the Line or to resolve any taking by eminent domain affecting the Line." Reply at 2. Additionally, Section 4.01 provides that, "TSR shall handle cars on the Line for the account of MEC. MEC shall have and retain the exclusive right to deal directly with shippers and receivers

regarding traffic.." *Id.* Further, Section 5.03 permits MEC to "...provide service on the Line itself or through a carrier designated by MEC." in the event that TSR fails to provide service in accordance with the terms of the Lease. *Id.* Plainly, therefore, there is nothing in the terms of the Lease that would indicate that MEC intended to cede its ownership interest and common carrier rights and obligations in the Line to TSR or anyone else. Reply 2-3. *See generally, State of Maine, Dept. of Trans.—Acquisition and Operation Exemption—Maine Central RR Co.,* 8 I.C.C.2d 835 (1991). Consequently, because MEC owns the Western Segment and is a "carrier by railroad" and has been such a carrier throughout the term of the Lease, only MEC may seek authority to abandon the Western Segment.

TSR may argue that the Western Segment has already been abandoned and, therefore, the remedy they seek is appropriate. On August 17, 2004, TSR filed a Verified Notice of Exemption, pursuant to 49 C.F.R. 1152 Subpart F – *Exempt Abandonments,* seeking to abandon and discontinue the Western Segment "so as to be able to sell and/or salvage the rail, ties and other track materials[.]" *Twin State,* Verified Notice of Exemption, pg. 7, attached hereto as Exhibit "D" without attachments. However, this argument is misleading and incorrect as a matter of law, for as discussed previously, TSR has not and cannot consummate its abandonment and discontinuance authority until the STB imposed conditions are met, and in any event, MEC has not sought or received abandonment and discontinuance authority.

### 3. TSR 's remedies under the ICA.

The ICA provides TSR with two (2) possible remedies. First, pursuant to 49 U.S.C. § 10903, TSR may seek to adversely abandon MEC's common carrier rights and

obligations with regard to the Western Segment, which would remove the jurisdiction of the STB and the preemptive effect of section 10501(b) thereby allowing TSR to pursue an order declaring the rights of the parties pursuant to the Lease in state or federal court. *See Milford – Bennington Railroad Company, Inc. Trackage Rights Exemption – Boston and Maine Corporation and Springfield Terminal Railway Company*, ICC Finance Docket No. 32103 (ICC Served September 3, 1993), pg. 2. If such an application were granted, the STB "would withdraw [its] primary jurisdiction over the [Western Segment], thereby clearing the way for the operation of state law." *State of Maine* at 6 *citing Modern Handcraft, Inc. – Abandonment*, 363 I.C.C. 969 (1981); *Kansas City Pub. Ser. Frgt. Operation Exempt. – Aban.*, 7 I.C.C.2d 216, 224-26 (1990); *Chelsea Property Owners – Aban. – The Consol. R. Corp.*, 8 I.C.C.2d 773, 778 (1992), *aff'd sub nom. Conrail v. ICC*, 29 F.3d 706 (D.C. Cir. 1994). Specifically, the STB has previously granted adverse abandonment authority to parties, similar to TSR, who wish to assert their rights under a contract, so that they may pursue that action. *Id. citing Grand Trunk Western Railroad Incorporated – Adverse Discontinuance of Trackage Rights Application – A line of Norfolk and Western Railroad Company in Cincinnati, Hamilton County, OH*, STB Docket No. AB-31 (Sub No. 30) (STB served May 13, 1998).

Second, pursuant to "5 U.S.C § 554(e) and 49 U.S.C. § 721, the Board has discretion to issue a declaratory order to terminate a controversy or remove uncertainty." *MVC Transportation, LLC – Acquisition Exemption – P&LE Properties, Inc.*, STB Finance Docket No. 34462, *MVC Transportation, LLC – Petition for Declaratory Order*, STB Finance Docket No. 34462 (Sub No. 1) (STB Decided October 20, 2004). Therefore, TSR may also seek an order from the STB declaring that MEC, according to

the terms of the Lease, transferred fee ownership and its common carrier rights and obligations to TSR.

**B.    This case should be referred to the STB under the doctrine of primary jurisdiction.**

In the alternative, should the Court determine that remedy sought by TSR is properly brought before this Court; the dispute should be stayed and referred to the STB under the doctrine of primary jurisdiction. "The primary jurisdiction doctrine is intended to 'serve [ ] as a means of coordinating administrative and judicial machinery' and to 'promote uniformity and take advantage of agencies' special expertise'" *Pejepscot*, 215 F.3d at 205 *citing Mashpee Tribe v. New Seabury Corp.*, 593 F.2d 575, 580 (1st Cir. 1979).

Because the present cause of action involves (1) a determination that "l[ies] at the heart of the task assigned to [the STB] by Congress"; (2) STB's expertise is required to "unravel intricate, technical facts" surrounding abandonment authority; and (3) in light of the highly technical nature of the facts, the STB's determination would "materially aid the court," the action should be stayed and referred to the STB. *Id. citing Commonwealth of Massachusetts v. Blackstone Valley Elec. Co.*, 67 F.3d 981, 992 (1st Cir. 1995). *See also Boston and Maine Corp, v. Town of Ayer*, 191 F. Supp.2d 257, 259 (D. Mass 2002).

## III.    CONCLUSION

Therefore, the broad preemption provision of section 10501(b) and the STB's exclusive oversight of the abandonment and discontinuance of rail lines, clearly indicate that TSR's state law cause of action is preempted.

December 3, 2004

Respectfully submitted,

Katherine E. Potter
BBO# 657126
Iron Horse Park
North Billerica, MA 01862
(978) 663-1029
kpotter@guilfordrail.com

*Counsel for Defendant*
*Springfield Terminal Railway Co.*

16

# EXHIBIT A

## LEASE AND OPERATING AGREEMENT

THIS LEASE AND OPERATING AGREEMENT ("Agreement") dated as of the 1st day of March _____, 1984, by and among MAINE CENTRAL RAILROAD COMPANY, a Maine corporation ("MEC"), TWIN STATE RAILROAD CORPORATION, a Vermont corporation ("TSR"), and LAMOILLE VALLEY RAILROAD COMPANY, a Vermont corporation ("LVRC").

### WITNESSETH:

WHEREAS, MEC, LVRC, the State of Vermont ("Vermont") and Guilford Transportation Industries, Inc. ("Guilford"), the owner of all of the outstanding common stock of MEC, have executed and delivered a Settlement Agreement dated as of November 1, 1983 (the "Settlement Agreement"), pursuant to which they have agreed to resolve, as of the Effective Date (as defined below), certain disputes arising in connection with the acquisition by Guilford of control of Boston and Maine Corporation ("B&M"); and

WHEREAS, the Settlement Agreement provides that MEC and LVRC will enter into an agreement for the operation of the line of railroad of MEC from Whitefield, New Hampshire to St. Johnsbury, Vermont by LVRC; and

WHEREAS, TSR has been organized as a wholly-owned subsidiary of Northern Vermont Corporation, which is also the owner of all of the outstanding stock of LVRC, to operate the Line (as defined below) as the designee of LVRC;

NOW, THEREFORE, the parties hereto, in consideration of the mutual promises and covenants set forth herein and intending to be legally bound, hereby agree as follows:

## I.   GRANT OF AUTHORITY

1.01   In consideration of the payment, as of the Effective Date, of the sum of $200,000 by TSR to MEC, MEC hereby leases and grants to TSR the right to use and operate, during the term of this Agreement and subject to the provisions of this Agreement and to the limitations set forth in Sections V and VI below, the line of railroad of MEC between the east MEC yard limit sign at approximately Mile Post P 103, Whitefield, New Hampshire and the west end of the MEC main track at approximately Mile Post 131.15, St. Johnsbury, Vermont, except a parcel of real property consisting of approximately 9.2 acres at South Lunenburg, Vermont, situated northerly of a line approximately 900 feet long lying 50 feet northerly of and parallel to the monumented baseline of MEC between the Connecticut River and Lunenburg State Aid Highway

- 2 -

No. 1.  TSR shall have the right to use and operate the line of railroad and all appurtenant facilities, including tracks, bridges, culverts, signals, fences and buildings, which are used in connection with the operation of the line, all of which shall be referred to in this Agreement as the "Line".

1.02  MEC hereby assigns to TSR all leases, sidetrack agreements, licenses, private crossing agreements and other such agreements in connection with or relating to the Line listed in Appendix A attached hereto.  TSR shall have the right on its own behalf to enter into such additional leases, sidetrack agreements, licenses, private crossing agreements or other such agreements in connection with or relating to the Line, subject, however, to the prior written consent of the Chief Engineer of MEC, which consent shall not be unreasonably withheld, and to collect and receive for its own account any rents or payments with respect to all such agreements.  TSR shall have the right and responsibility to enter into agreements with states, municipalities or administrative agencies relating to highway grade crossings, highway bridges or grade crossing protection on the Line, subject, however, to the prior written consent of the Chief Engineer of MEC, which consent shall not be unreasonably withheld.  MEC shall have and retain the exclusive right, and TSR shall be precluded from

- 3 -

claiming or exercising any right, to enter into agreements, so long as any such agreements do not adversely affect the operation of the Line, to convey the fee interest in any real property constituting part of the Line, to grant an easement affecting the Line or to resolve any taking by eminent domain affecting the Line.  Upon termination of this Agreement, TSR shall assign or reassign to MEC all leases, sidetrack agreements, licenses, private crossing agreements and other such agreements in connection with or relating to the Line.

1.03  TSR may request MEC to retire any property on, or portion of, the Line which may no longer be required for the performance of the duties of TSR under this Agreement, and MEC shall not unreasonably withhold approval of such requests.  TSR may retain for its own account any property recovered or proceeds received incidental to any such retirement, but retirement accounting shall be performed by MEC.

II.  COVENANTS OF LVRC

TSR hereby covenants and agrees as follows:

2.01  As of the Effective Date, TSR shall pay to MEC the sum of $200,000.

2.02   During the term of this Agreement, TSR shall operate the Line and shall provide train service which will be equal in all respects, including frequency, reliability and speed, to the service presently provided on the Line by MEC or such other manner of service as may be warranted by traffic levels and operating conditions as they may exist from time to time.  TSR acknowledges that presently MEC provides service upon the demand of customers six days per week.  TSR shall provide all locomotives, personnel and any other equipment (except that cars for loading shall be provided as stated in Section IV below) necessary in order to provide such service.

2.03   TSR shall offer to employ one MEC employee presently assigned to maintenance-of-way duties on the Line.

2.04   TSR shall assume and bear all costs related to its operation of the Line.

2.05   TSR shall file any returns or reports required by Vermont or New Hampshire in respect of franchise, corporate or income taxes and shall pay any taxes assessed on the basis of the earnings or income of, or operation of the Line by, TSR.  TSR shall pay (i) 37.5% of the Vermont property and franchise tax, 32 Vermont Statutes Annotated, Chapter 211, §§ 8211-8286, as it or a similar tax law based on the value of

property used for railroad operations may be in effect from time to time, assessed in respect of that portion of the Line which is located in Vermont and (ii) 37.5% of the New Hampshire railroad and public utility tax, 1-A New Hampshire Statutes Annotated, Chapter 82, §§ 1-38, as it or a similar tax law based on the value of property used for railroad operations may be in effect from time to time, assessed in respect of that portion of the Line which is located in New Hampshire, whether any such taxes are assessed against TSR or MEC or both.   Except for property taxes to be paid by MEC pursuant to Section 3.02 below and except as provided in the preceding sentence, TSR shall pay any other property taxes assessed on the Line.

2.06   TSR shall, at its own expense, maintain the Line in good condition and repair so that freight train operations can be conducted on the Line as warranted by traffic levels in a safe, efficient and economical manner and in compliance with all federal and state laws and regulations. Any property or materials used by TSR to replace or repair any property or materials in the Line shall be of equal or better quality compared to the property or materials so replaced or repaired.

2.07   TSR shall indemnify and save MEC, its parent and its officers, agents and employees harmless from and

- 6 -

against all liabilities, claims, charges, costs and expenses of whatever nature arising from or in connection with the use, operation or maintenance of the Line by TSR.

2.08    TSR shall, at all times during the term of this Agreement, maintain, from insurers approved by MEC, which approval shall not be unreasonably withheld, the following types and amounts of insurance coverage:

(a)    insurance against loss or damage to property, including without limitation property of MEC, cargo and rolling stock, and against injury or death to persons, including without limitation employees of MEC, arising or incurred in connection with the operation, use or maintenance of the Line, in minimum amounts of (i) $1,000,000 for injury or death of any person and $2,000,000 for injury or death arising out of any occurrence and (ii) $1,000,000 for any loss of or damage to property and $2,000,000 for loss or damage arising out of any occurrence, in each case subject to a deductible not in excess of $25,000; and

>        (b)    insurance against loss or damage by
>    fire and against loss or damage by other risks
>    now or hereafter embraced by the terms "extended
>    coverage" and "vandalism and malicious mischief"
>    to any bridges located on the Line in an amount
>    of $1,000,000 for any occurrence, subject to a
>    deductible not in excess of $25,000.

TSR shall maintain the insurance described in subsection
2.08(a) above at its sole expense and shall pay 37.5% of the
cost of the insurance described in subsection 2.08(b) above.

## III.   COVENANTS OF MEC

MEC hereby covenants and agrees as follows:

3.01   MEC shall pay TSR $300 for each loaded car (but
not including any MEC company material cars or MEC non-revenue
equipment) handled by TSR on the Line.  On January 1, 1985, and
on January 1 of each succeeding year this Agreement is in force
and effect, the amount paid by MEC to TSR for each loaded car
so handled by TSR shall be increased or decreased, as the case
may be, by multiplying $300 by a fraction, the numerator of
which shall be the "Labor, Fuel and Materials and Supplies
Combined" portion of the Railroad Cost Recovery Index of the
Association of American Railroads and the denominator of which

shall be such Index as of January 1, 1984. If the Association

of American Railroads ceases publication of such Index, the

parties hereto shall utilize such other index, for the purpose

of adjusting the payment for each loaded car, that fairly

reflects the increased or decreased costs of labor, fuel and

materials and supplies incurred in operating railroads in the

United States. No payment shall be due from MEC to TSR for the

handling by TSR of empty cars which are loaded or made empty on

the Line. TSR shall bill MEC after the conclusion of each

month. Such bills shall show the car number and the date or

dates of handling for each loaded car for which payment is

requested. Within 15 business days after the receipt of any

such bill, MEC shall make the payment due TSR.

3.02 MEC shall file any returns or reports required

by Vermont or New Hampshire in respect of franchise, corporate

or income taxes and shall pay any taxes assessed on the basis

of the income or earnings of MEC in respect of the Line. MEC

shall pay (i) 62.5% of the Vermont property and franchise tax,

32 Vermont Statutes Annotated, Chapter 211, §§8211-8286, as it

or a similar tax law based on the value of property used for

railroad operations may be in effect from time to time,

assessed in respect of that portion of the Line which is

located in Vermont and (ii) 62.5% of the New Hampshire railroad

- 9 -

and public utility tax, 1-A New Hampshire States Annotated,
Chapter 82, §§1-38, as it or a similar tax law based on the
value of property used for railroad operations may be in effect
from time to time, assessed in respect of that portion of the
Line which is located in New Hampshire, whether any such taxes
are assessed against MEC or TSR or both.  MEC shall pay
property taxes assessed on the parcel of real property
described in Section 1.01 above as not being subject to this
Agreement.

3.03  MEC shall pay 62.5% of the cost of the
insurance described in subsection 2.08(b) above.

## IV.  OPERATION AND TRAFFIC

4.01  TSR shall handle cars on the Line for the
account of MEC.  MEC shall have and retain the exclusive right
to deal directly with shippers and receivers regarding traffic
moving to or from the Line and to solicit such traffic in the
best interests of MEC and the railroad system owned by Guilford
(hereinafter referred to as the "Guilford system").  MEC shall
provide all station agency functions related to the operation
of the Line and shall furnish TSR such information as may be
necessary for TSR to provide service to customers on the Line.
MEC shall provide TSR with instructions concerning delivery

- 10 -

locations for traffic moving to or from the Line, and TSR shall comply with such instructions.  TSR shall furnish MEC weekly with copies of each daily "Conductor's Train Report" completed with information relating to cars handled on the Line during each week.  MEC shall have the right, at reasonable times, to review and obtain copies of any records of TSR or LVRC relating to traffic handled by TSR on the Line.

4.02  TSR shall first use Guilford system cars supplied to TSR for loading for any shippers located on the Line.  To the extent that Guilford system cars are not so available, TSR may provide TSR or LVRC cars for loading.  In the event that neither Guilford system cars nor TSR or LVRC cars are available, TSR shall use cars supplied to it by any Guilford system railroad.

4.03  TSR shall operate the Line under its own rules, except that TSR shall incorporate into its operating instructions MEC Time Table Special Instructions as they may be pertinent to operations of the Line, including MEC Time Table No. 2, dated April 11, 1982, pages 2 through 7 under Sections (Rules) 33a, 33b, 93, 98, 110 and 695.

## V.  DEFAULTS BY LVRC AND REMEDIES OF MEC

5.01   The following events or occurrences shall constitute defaults by TSR under this Agreement:

(a)   the failure or inability of TSR to provide service on the Line, except when such failure or inability is caused by an event or occurrence such as an act of God, vandalism, strike, or order of a court or other governmental authority which (i) is not attributable, directly or indirectly, to any act or failure to act by TSR and (ii) cannot be cured by TSR without unreasonable delay or expense;

(b)   the failure to maintain the Line in accordance with the standard established in Section 2.06 above;

(c)   the failure to pay any of the costs and expenses to be paid by LVRC pursuant to Section 2.04 or Section 2.05 above; or

(d)   the failure to comply with or to perform any other covenant or agreement undertaken by TSR pursuant to this Agreement.

- 12 -

5.02   In the event that MEC gives TSR and LVRC written notice of the occurrence of any default under this Agreement and TSR or LVRC, pursuant to Section XII below, does not cure any such default within 30 days after such notice, then MEC may, by further written notice to TSR and LVRC, with a copy to Vermont, terminate the rights and obligations of TSR and LVRC under this Agreement.

5.03   Notwithstanding any other provision of this Agreement, in the event that TSR fails to provide service in the manner required by Section 2.02 above, MEC may, at its option, provide service on the Line itself or through a carrier designated by MEC.

## VI.   SUBSTITUTION OF OPERATOR

6.01   The rights and obligations of TSR and LVRC under this Agreement shall terminate, but the Agreement shall remain in full force and effect, upon the occurrence of either of the following two events:

(a)   provision of notice by MEC to TSR and LVRC of a default, as provided in Section 5.02 above, which TSR or LVRC has failed to cure within 30 days after notice of such default; or

(b) provision of notice by Vermont to MEC
and LVRC to the effect that LVRC is in default
under its lease with Vermont concerning the
operation of the line of railroad between
Swanton, Vermont and St. Johnsbury, Vermont or
to the effect that LVRC has failed to renew such
lease.

In either event, Vermont may, by notice to MEC and to TSR and
LVRC, designate a new operator of the Line in place of TSR.

6.02  Subject to the approval of Guilford and
the approval of or exemption by any regulatory agency which may
have jurisdiction over such matters, any new operator so
designated by Vermont shall assume all of the rights and
obligations of TSR, except the rights set forth in Section VII
below, under this Agreement.

## VII.   TERMINATION BY TSR

TSR may, at its option, terminate this Agreement (i)
for any reason within two years after the Effective Date or
(ii) if it handles less than 1,100 carloads on the Line in any
calendar year during the period beginning on the second
anniversary of the Effective Date and ending on December 31,
1988.  If TSR so terminates this Agreement, or if the Agreement

- 14 -

terminates pursuant to the last sentence of Section VIII below,
MEC shall pay TSR the sum of $200,000; provided, however, that
MEC shall have no obligation to pay any amount to TSR if the
rights and obligations of TSR are terminated pursuant to
Section VI above.

VIII.   TERM

        The initial term of this Agreement shall be from the
Effective Date through December 31, 1988.  At its option, TSR
may renew this Agreement for a maximum of four 10-year periods
subsequent to December 31, 1988.  Notwithstanding any other
provision of this Agreement, it shall terminate and be of no
further force and effect as of June 30, 1984, unless such date
is extended by MEC, in the event that Vermont has not provided
assurances satisfactory to MEC by such date to the effect that
Vermont has obtained the authority necessary to fulfill the
obligations assumed by Vermont with respect to certain public
structures and grade crossings in Vermont pursuant to paragraph
5 of the Settlement Agreement.

IX.   NOTICES

        All notices, requests and demands to or upon the
parties hereto shall be deemed to have been given or made when
deposited in the United States mails, postage prepaid,
addressed as follows: