# EXHIBIT C

*212048*

**BEFORE THE**

**SURFACE TRANSPORTATION BOARD**

---

**DOCKET NO. AB-862X**

---

**TWIN STATE RAILROAD COMPANY—
ABANDONMENT AND DISCONTINUANCE OF SERVICE—
IN CALEDONIA AND ESSEX COUNTIES, VERMONT**

---

**REPLY OF THE MAINE CENTRAL RAILROAD COMPANY
TO VERIFIED NOTICE OF EXEMPTION**

SEP ... 20...

Robert B. Culliford
Iron Horse Park
North Billerica, MA 01862
(978) 663-1029
rculliford@guilfordrail.com

Attorney for
Maine Central Railroad Company

September 20, 2004


SEP 21 2004
RECEIVED

BEFORE THE

SURFACE TRANSPORTATION BOARD

---

DOCKET NO. AB-862X

---

TWIN STATE RAILROAD COMPANY—
ABANDONMENT AND DISCONTINUANCE OF SERVICE—
IN CALEDONIA AND ESSEX COUNTIES, VERMONT

---

REPLY OF THE MAINE CENTRAL RAILROAD COMPANY
TO VERIFIED NOTICE OF EXEMPTION

## I.  INTRODUCTION

The Maine Central Railroad Company ("MEC") hereby replies to the "Verified Notice of Exemption" ("Notice") filed by the Twin States Railroad Company ("TSR") on August 17, 2004 seeking authority to abandon and discontinue service over a portion of a rail line between milepost 0.057 in St. Johnsbury, Vermont and Engineering Station 5503 in Gilman, Vermont (the "Line").[1]  Because the Notice contains numerous misrepresentations, incorrect assumptions and evidences a complete misunderstanding of the status of the Line, MEC is filing this reply to request that the Board impose certain conditions on the abandonment and discontinuance of service by TSR so that MEC's common carrier rights and obligations on the Line will not be compromised.

---

[1] While styled a Notice of Exemption to Abandon and Discontinue service, as discussed in more detail below the proper relief would be discontinuance authority, as TSR retains a leasehold interest only.

1

## II.   ARGUMENT

### A. MEC Continues to Own the Line and Maintains its Common Carrier Rights and Obligations Notwithstanding TSR's Intent to Discontinue its Leasehold Interest.

First and foremost, TSR seems to confuse its leasehold interest in the Line with that of fee simple ownership and the consequent right to treat this property as its own. Yet, as TSR repeatedly acknowledges throughout the Notice and in its exhibits, TSR's interest in the Line is limited to that of a lessee. Moreover, by entering into a lease dated March 1, 1984, Exhibit A to the Notice (the "Lease"), MEC did not evidence any intent to convey ownership in the Line or its common carrier rights and obligations to TSR or anyone else, nor has MEC evidenced any such intent throughout the term of the Lease.

More particularly, the Lease itself makes it clear that it was the intent of both parties that MEC retain its ownership interest and common carrier rights and obligations in the Line, as evidenced by several sections of the Lease. For example, Section 1.02 of the Lease reserves to MEC the exclusive rights, "…to convey the fee interest in any real estate property constituting part of the Line or to resolve any taking by eminent domain affecting the Line." Additionally, Section 4.01 provides that, "TSR shall handle cars on the Line for the account of MEC. MEC shall have and retain the exclusive right to deal directly with shippers and receivers regarding traffic.." Further, Section 5.03 permits MEC to "…provide service on the Line itself or through a carrier designated by MEC." in the event that TSR fails to provide service in accordance with the terms of the Lease. Plainly, therefore, there is nothing in the terms of the Lease that would indicate that MEC intended to cede its ownership interest and common carrier rights and obligations in the

2

Line to TSR or anyone else. *See generally, State of Maine, Dept. of Trans.—Acquisition and Operation Exemption—Maine Central RR Co.*, 8 I.C.C.2d 835 (1991).

Furthermore, even if the Lease itself did not clearly show that MEC intended to maintain its common carrier rights and obligations in the Line, it is settled law that when a carrier leases a line of railroad to another party, the lessor carrier not only retains its common carrier rights and obligations, but is also required to provide common carrier service in the event that its lessee were to receive authority to discontinue its operations. *Lehigh Valley RR Co. Proposed Abandonment of Operation*, 202 I.C.C. 659, 663 (1935); *Livestock Terminal Service Co. Abandonment of Operation*, 257 I.C.C. 1, 7 (1944); *Meyers v. Famous Realty, Inc.*, 178 F.2d 811, 814 (2nd Cir., 1959). As a result, notwithstanding the efforts of TSR to discontinue its own common carrier rights and obligations over the Line, MEC continues to have such status and the Line will remain subject to the jurisdiction of the Board until such time as MEC applies for and receives authority to abandon and discontinue its common carrier status. *Meyers v. Famous Realty, Inc.* 178 F.2d at 814.

While MEC's continuing ownership interest and common carrier rights and obligations may seem clear from the Lease and established precedent, TSR apparently views this matter in an entirely different light. Rather than simply discontinue its leasehold interest, TSR claims to have the right to also remove the rail, ties, and other track materials for sale, ostensibly to recover its investment in the Line because MEC has somehow breached the Lease.[2] Of course, to permit TSR to take such a step would

---

[2] Similarly, TSR's claims regarding MEC's alleged breach of the Lease and its resulting remedies are not only unfounded, but are also state law claims that would be preempted until MEC abandons and discontinues its interest in the Line. *49 U.S.C. § 10501(b)*, *Chicago and Northwestern Trans. Co. v. Kalo Brick & Tile Co.*, 446 U.S. 951 (S. Ct. 1980), *Milford-Bennington RR Co., Inc.—Trackage Rights*

3

effectively destroy the ability of MEC or its assigns to continue operations and would be a de facto and illegal abandonment of MEC's common carrier rights and obligations in the Line. Accordingly, MEC requests that the Board specifically condition any discontinuance authority upon TSR leaving undisturbed the track, ties and other track materials along the entire length of the Line to permit MEC or its assignee to provide service over the Line in the future, if warranted.

**B. TSR's Representations in the Notice are Misleading and Incorrect.**

In a transparent effort to obtain authority from the Board to unjustly enrich itself through the salvage of rail, ties and other track materials on the Line, TSR has proffered several reasons why MEC has purportedly breached its obligations under the Lease as well as why the Line will never be profitable. Upon a cursory review of the facts underlying the Notice, however, it is plain that TSR is in most instances distorting the history of this transaction, as well as the present state of operations and the Line itself.

First, TSR claims that it has complied with its obligations to maintain the Line in accordance with Section 2.06 of the Lease by purportedly keeping the Line in good condition and repair as warranted by traffic levels. *Notice, p. 5.* TSR then goes on to claim that this maintenance standard is lowered by the lack of customers on the Line. *Id.* Of course, TSR conveniently omits several relevant facts in the Notice. First, TSR is correct in identifying its obligation to maintain and repair the Line as warranted by traffic levels, but somehow overlooks the fact that Section 2.06 of the Lease also requires TSR to maintain the Line *in compliance with all federal and state laws and regulations.*

---

Exemption--Boston and Maine Corp. and Springfield Terminal Railway Co., Finance Docket No. 32103, Served September 3, 1993. Likewise, TSR's decision to unilaterally terminate its operating authority is a breach of its obligations pursuant to the Lease, which will also be a matter for an action under state law by MEC.

4

Of course, the actual condition of the Line shows the fallacy of TSR's statements, as TSR clearly has not performed *any* maintenance or repair work on the Line for several years, and the Line is far from compliance with the Federal Railroad Administration Track Safety Standards as a result. *See, for example,, 49 C.F.R. §213.37.* Further, the Line has also fallen into such disrepair that if a customer were to demand service—which has occurred, as discussed further below—such service would not be possible absent extensive rehabilitation, a delay that would not be necessary had *any* work been performed on the Line by TSR. To provide the Board with a more accurate portrayal of TSR's maintenance and repair practices—such as they are—MEC has attached hereto as Exhibit A pictures showing the extensive deterioration of the Line, conclusively showing that TSR's assertions regarding its efforts to comply with the terms of the Lease are without merit.

Second, TSR alleges that MEC has "failed miserably" in its obligation to deal directly with customers regarding traffic on the Line, despite TSR's own admission that the development of traffic on this Line has been difficult at best. *Notice, pp. 4-5.* However, TSR once again fails to tell the entire story, as it somehow omits the fact that MEC has been working with its connecting carriers to develop rail freight business to the paper mill at Gilman which—again contrary to the implication by TSR—is operating today and is interested in rail service. *See attached Exhibit A.* Furthermore, the major impediment to MEC's efforts to market rail service to this mill has been TSR's unwillingness to perform the requisite rehabilitation on not only the Line, but also the remainder of the track subject to the Lease that is presently owned by the State of New Hampshire. In fact, each time that MEC receives a request for rates to or from Gillman

5

from its connecting carriers, MEC contacts TSR requesting an update as to the status of the Line and when it would be in a condition to support rail service. *See, attached Exhibits B-D.* In one response, an attorney for TSR asserted that the Line would be in a condition to support the service in the spring of 2003, although as the pictures attached hereto as Exhibit A show, this statement was incorrect. *See attached Exhibit E.* In another response, the same attorney for TSR seem to believe that a request for service was made for movement over the Line to St. Johnsbury, Vermont, which would contradict TSR's claim that no request for service has been made by the mill since October of 1999. *See attached Exhibit F. Notice, p. 5.* [3] Clearly, MEC has attempted to develop rail service to the mill at Gilman—service that could be provided today if the Line could support it—but the failure of TSR to meet its commitments presently precludes rail as an option to this facility on either the Line or the remainder of the trackage owned by the State of New Hampshire.

TSR also seems to connect the sale of the easterly portion of the track by MEC to the State of New Hampshire with its allegations that MEC has "failed miserably" to market rail traffic on the Line. Under the best of circumstances, it is difficult to make this connection, but to make matters worse for TSR, the sale of the easterly portion of the Line did not effect any practical or legal change to the nature of operations over the entire track. Rather, MEC simply conveyed its ownership and common carrier rights and obligations to the State, but did nothing to affect TSR's ability to operate over the entire trackage, as MEC assigned its rights and obligations under the Lease to the easterly

---

[3] In his March 21, 2003 response, the attorney for TSR is apparently confused by the nature of railroad operations in this region. MEC and its affiliates were contacted for rates to the mill at Gillman because of their connections with other carriers at locations other than the Line. Therefore, MEC and its affiliates would have been contacted regardless of its ownership interest in the Line, but could not accurately respond to these inquiries without advice from TSR regarding the condition of the Line and plans for rehabilitation.

6

portion of the track to the State and has worked regularly with the State to develop rail business at the Gilman mill. *See attached Exhibit G.* Unfortunately, TSR's unwillingness or inability to restore the entire trackage to a condition that will support rail service has precluded either MEC or the State of New Hampshire from being able to effectively market a rail transportation alternative to the mill at Gilman from either direction. MEC is also at a loss to understand how TSR can claim that the sale to the State of New Hampshire affected TSR at all, since TSR remains the lessee of the entire track, not just the Line, and can operate in either direction notwithstanding the State's ownership interest.

Third, TSR relies upon a study performed on *a separate line of railroad* to imply that the highest and best use of the Line would be for non-railroad purposes since there is little likelihood of a return of railroad service to this separate line of railroad. *Notice, pp. 1-2.* To further buttress its argument, TSR next alleges that MEC and the State of Vermont Agency of Transportation ("VTRANS") have been negotiating the possible acquisition of the Line for conversion to a snowmobile trail by VTRANS. *Notice, p. 6.* Of course, if this assertion were correct, it is doubtful that VTRANS would have filed with the Board a notice of its intent to investigate an offer of financial assistance, a procedure only available if rail service were to continue on the Line. Once again, TSR seems to be wrong on the basic facts.

Finally, TSR relies upon proceedings before the Interstate Commerce Commission ("I.C.C.") some 20 years ago to posture itself as being entitled to compensation because the Lease has not been profitable for TSR. *Notice, pp. 2-4.* Simply put, TSR's characterization of this transaction is completely wrong, as the proceedings

7

relied upon by TSR clearly show that the I.C.C. did not agree with the characterization of the harmful effects of this transaction put forth on behalf of TSR. Specifically, in denying a request that certain lines be conveyed as part of the control transaction, the I.C.C. found that:

> "LVRC has not met the difficult burden of showing an adverse effect on essential services. Obviously, the overhead service provided by LVRC is not essential, since a number of other connections to the Canadian routes exist. To the extent LVRC's local service is affected by the primary transaction, we believe that motor carrier service is reasonably adequate to fill any conceivable transportation void. The overall impact, therefore, is negligible."

*Guilford Transportation Industries, Inc.—Control—Boston and Maine Corp.*, 366 I.C.C. 394, 354 (1982). In fact, the Lease itself states that it was entered into to resolve litigation brought by LVRC when it did not receive satisfaction at the I.C.C. Plainly, therefore, TSR's attempts to portray itself as the savior of rail service in this region are overstated.

### III.    CONCLUSION

In light of the foregoing, MEC respectfully requests that the Board condition any discontinuance authority to require TSR or any person or entity acting in concert with TSR, to leave the Line, track, ties and other track material in place and undisturbed.

**September 30, 2004**

8

Respectfully submitted,

Robert B. Culliford
Iron Horse Park
North Billerica, MA 01862
(978) 663-1029
rculliford@guilfordrail.com

Attorney for
Maine Central Railroad Company

9

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of September, 2004, I caused to be served the foregoing document upon all parties to this proceeding by first class mail, postage prepaid.

Robert B. Culliford

# EXHIBIT B - D



**BOSTON & MAINE CORPORATION**
**MAINE CENTRAL RAILROAD COMPANY**
**SPRINGFIELD TERMINAL RAILWAY COMPANY**

IRON HORSE PARK
NO. BILLERICA, MASS. 01862

## MARKETING DEPARTMENT
### (978) 663-6938
### Fax (978) 663-1009

July 7, 2004

Twin State Railroad Corporation
P.O. Box 1267
Trenton, FL 32693

Lamoille Valley Railroad Company
P.O. Box 1360
Trenton, FL 32693

Dear Mr. Forbes,

On July 7, 2004, Guilford Rail System received an inquiry from Georgia Pacific-Old Town, ME regarding rates for the movement of 25 cars of woodpulp from Old Town, ME (Georgia Pacific) to Gilman, VT via the "Twin State Railroad" (the "Line"), which you are the current operator. It has been brought to my attention that the line has been embargoed due to track conditions. Due to the present condition of the Line, I am writing to obtain a determination as to the period of time you will require to improve the track condition to allow for the movement of the aforementioned cars.

Please provide the requested information as soon as possible as we intend to respond to GP's request by close of business today. Should you have any questions or comments, please do not hesitate to call.

Sincerely,

M. P. Bostin

Michael Bostwick
Vice President

7003 2260 0000 2041 2609

CERTIFIED MAIL

7003 2260 0000 2041 2609
7003 2260 0000 2041 2609



**BOSTON & MAINE CORPORATION**
**MAINE CENTRAL RAILROAD COMPANY**
**SPRINGFIELD TERMINAL RAILWAY COMPANY**

IRON HORSE PARK
NO. BILLERICA, MASS. 01862

### MARKETING DEPARTMENT
(978) 663-6938
Fax (978) 663-1009

June 29, 2004

Twin State Railroad Corporation
P.O. Box 1267
Trenton, FL 32693

Lamoille Valley Railroad Company
P.O. Box 1360
Trenton, FL 32693

Dear Mr. Forbes,

On June 14, 2004, Guilford Rail System received an inquiry from Canadian National regarding rates for the movement of 10 cars of woodpulp from Jonquire, PQ to Gilman, VT via the "Twin State Railroad" (the "Line"), which you are the current operator. It has been brought to my attention that the line has been embargoed due to track conditions. Due to the present condition of the Line, I am writing to obtain a determination as to the period of time you will require to improve the track condition to allow for the movement of the aforementioned cars.

Please provide the requested information as soon as possible as we intend to respond to CN's request by close of business today. Should you have any questions or comments, please do not hesitate to call.

Sincerely,

*M. P. Bostwick*

Michael Bostwick
Vice President

7003 2260 0000 2041 2586

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE
**CERTIFIED MAIL**

7003 2260 0000 2041 2586
7003 2260 0000 2041 2586

U.S. Postal Service
CERTIFIED MAIL



**BOSTON & MAINE CORPORATION**
**MAINE CENTRAL RAILROAD COMPANY**
**SPRINGFIELD TERMINAL RAILWAY COMPANY**

IRON HORSE PARK
NO. BILLERICA, MASS. 01862

## MARKETING & SALES DEPARTMENT
### 978-663-6929

March 14, 2003

Twin State Railroad Corporation
P.O. Box 1267
Trenton, FL 32693

Lamoille Valley Railroad Company
P.O. Box 1360
Trenton, FL 32693

Dear Mr. Forbes,

Attached please find a copy of the March 12, 2003 edition of the Atlantic Northeast Rails & Ports. As indicated in Mr. Hardenbergh's article, the Steve Regan Company has purchased the mill and power dam at Gilman, Vermont. The Dirigo Paper Company has agreed to operate the mill with the Siman Paper Group as its primary customer. Dirigo is planning to use rail service, both inbound and outbound.

Currently, the "Twin State Railroad" (the "Line") is embargoed due to track conditions. In light of this potential business and the present condition of the Line, I am writing to obtain a determination as to the period of time you will require to improve the track condition to allow for the movement of cars.

Please provide the information as soon as possible as we would like to respond to any rate requests that we may receive. Should you have any questions or comments, please do not hesitate to call.

Sincerely,

Mr. Richard M. Willey
Senior Vice President
Marketing & Sales
Guilford Rail System

CC:    David H. Anderson, Esquire (via fax)
       Leonard M. Singer, Esquire
       R. Culliford



CRAIGHEAD GLICK LLP
COUNSELLORS AT LAW

Leonard M. Singer

??? DARTMOUTH STREET BOSTON MASSACHUSETTS 02116     PHONE 617 859 8200     FAX 617 859 7???

March 24, 2003

Richard M. Willey
Guilford Rail System
Iron Horse Park
North Billerica, MA  01862

Re:    Lease and Operating Agreement - Twin State Railroad Corporation

Dear Mr. Willey:

This will respond to your letter of March 14 addressed to Twin State Railroad Corporation.  Twin State anticipates that its railroad will be in condition to allow for the movement of cars as soon as the snow has melted sufficiently so that any required maintenance work can be performed.  We regard it as all but certain that any such work will be performed long before there is any need for any operation on the line.

If you need any further information, please do not hesitate to contact me.

Very truly yours,

Leonard M. Singer
Leonard M. Singer



CRAIGHEAD GLICK LLP
COUNSELLORS AT LAW

277 DARTMOUTH STREET BOSTON MASSACHUSETTS 02116     PHONE 617.859.8200     FAX 617.859.7272

Leonard M. Singer

March 21, 2003

Michael Bostwick
Maine Central Railroad Company
Iron Horse Park
North Billerica, MA 01862

Re:    Pulpwood - Philadelphia, Pennsylvania to Gilman, Vermont

Dear Mr. Bostwick:

This will respond to your inquiry to Clyde Forbes concerning the above-referenced potential movement. The rate for any movement over the Twin State Railroad Corporation is set forth in the Lease and Operating Agreement dated as of March 1, 1984 by and among Maine Central Railroad Company, Twin State Railroad Corporation and the Lamoille Railroad Company and, in particular, section 3.01 thereof.

We assume that this traffic will be routed via White River Junction and St. Johnsbury inasmuch as the inquiry concerning this traffic comes from Maine Central and St. Johnsbury note that Maine Central assigned all of its interest in the Lease and Operating Agreement to the State of New Hampshire with respect to the line of railroad between Whitefield, New Hampshire and Gilman, Vermont by instrument dated January 7, 2003. We understand that, as a result of that assignment, the State of New Hampshire has the exclusive right to deal with shippers and receivers regarding traffic on that portion of the railroad.

Very truly yours,

Leonard M. Singer

cc:     Craig S. Donais
        Katherine E. Potter



**EXHIBIT G**

## ASSIGNMENT OF LEASE AND OPERATING AGREEMENT

For consideration paid by the **STATE OF NEW HAMPSHIRE, THROUGH ITS DEPARTMENT OF TRANSPORTATION**, John Morton Building, 1 Hazen Drive, Concord, Merrimack County, New Hampshire ("Assignee") the **MAINE CENTRAL RAILROAD COMPANY**, a Maine Corporation with its principal place of business at Iron Horse Park, North Billerica, Massachusetts ("Assignor") hereby assigns unto the Assignee all of the Assignor's right, title and interest, if any, in the Lease and Operating Agreement between the Maine Central Railroad, the Lamoille Valley Railroad Corporation and the Twin State Railroad Corporation (the "Agreement") entered into on March 1, 1984 affecting a portion of the so-called Twin State Railroad as described in "Exhibit A". A copy of the Agreement is attached hereto as "Exhibit B".

**IN WITNESS WHEREOF**, the **MAINE CENTRAL RAILROAD COMPANY** has caused this Assignment to be executed in its behalf by Roland Theriault, Vice President, Real Estate of the **MAINE CENTRAL RAILROAD COMPANY**, on this 7th day of January, 2003.

Witness

By: _____
Roland Theriault
Vice President, Real Estate

## COMMONWEALTH OF MASSACHUSETTS

**Middlesex, ss**

January 7, 2003

Then personally appeared the above-named Roland Theriault, its Vice President for Real Estate of the **MAINE CENTRAL RAILROAD COMPANY** and acknowledged the forgoing instrument to be his free act and deed of said **MAINE CENTRAL RAILROAD COMPANY**, before me.

Notary Public
My Commission Expires: March 8, 2003