# EXHIBIT D

Before the
SURFACE TRANSPORTATION BOARD
Washington, DC

DOCKET NO. AB-862X

RECEIVED
AUG 17 2004
M. L
MANAGEMENT
STB

TWIN STATE RAILROAD COMPANY --
ADANDONMENT AND DISCONTINUANCE OF SERVICE
IN CALEDONIA AND ESSEX COUNTIES, VERMONT

**VERIFIED NOTICE OF EXEMPTION**

David H. Anderson, Esq.
Law Office of David H. Anderson
288 Littleton Road, Suite 21
Westford, MA  01450
(978) 392-9995

Counsel for the Twin State
Coast Railroad Company, Inc.

Dated: June 1, 2004

Before the
SURFACE TRANSPORTATION BOARD
Washington, DC

---

DOCKET NO. AB-862X

---

TWIN STATE RAILROAD COMPANY --
ADANDONMENT AND DISCONTINUANCE OF SERVICE
IN CALEDONIA AND ESSEX COUNTIES, VERMONT

---

**VERIFIED NOTICE OF EXEMPTION**

**INTRODUCTION**

Twin State Railroad Company, Inc. ("TSRR") hereby files this Verified Notice of Exemption pursuant to 49 C.F.R. 1152.50 in order to abandon and discontinue service over approximately twenty (20) route miles of rail line between railroad milepost 0.057 in St. Johnsbury, Vermont and railroad engineering station 5503 at River Road (Town Road) in Lunenburg (Gilman), Vermont, located in Caledonia and Essex Counties, Vermont (the "Subject Line").

The Subject Line is a portion of the TSRR's rail line that extends between St. Johnsbury, Vermont and Whitefield, New Hampshire (the "TSRR Line").

Related to this matter is a line of railroad owned by the State of Vermont, through its Agency of Transportation, which was previously operated by the Lamoille Valley Railroad Company ("LVRC") and which extended approximately 98 miles between Swanton, Vermont and St. Johnsbury, Vermont (the "LVRC Line"). The TSRR Line and the LVRC Line connected at St. Johnsbury, and thus comprised a continuous corridor from Swanton, Vermont to Whitefield, New Hampshire. Rail traffic on the LVRC Line dried up many years ago. A highest and best use analysis conducted by the State of

-2-

Vermont, indicated little or no likelihood of any return of rail traffic to the LVRC Line. Accordingly, and at the direction of the State of Vermont, the LVRC Line was recently abandoned. See, STB Docket No. AB-444 (Sub-No. 1X), *Lamoille Valley Railroad Company -- Abandonment and Discontinuance Exemption -- Caledonia, Washington, Orleans, Lamoille and Franklin Counties, Vermont*.

The LVRC and the TSRR were created to address the anti-competitive effects of the acquisition by Guilford Transportation Industries, Inc. of the Boston and Maine Corporation ("B&M"), the Delaware & Hudson Railway Company, Inc. ("D&H") and the Maine Central Railroad Corporation ("MEC"). To further explain the history of the Subject Line and its recent operations, TSRR would direct the Board to Finance Docket No. 29772, Guilford Transportation Industries, Inc. -- Control -- Boston and Maine Corporation (Decision served May 22, 1984), pursuant to which common control of LVRC and TSRR by the Northern Vermont Company ("NVC") was exempted from approval by the ICC.

TSRR would also direct the Board to Finance Docket No. 31545, Clyde S. and Saundra Forbes and CSF Acquisition, Inc. -- Acquisition of Control -- Northern Vermont Company (Decision served _____, 1989). As indicated in Finance Docket No. 31545, CSF Acquisition, Inc. ("CSF") owns 100% of the capital stock of NVC. NVC, in turn, owns 100% of the capital stock of the LVRC. LVRC operated the LVRC Line pursuant to lease and operating agreements with the State of Vermont from 1989 through the end of 2003. NVC also owns 100% of the capital stock of TSRR, which, since 1984, has operated the TSRR Line pursuant to a long-term lease agreement with MEC.

-3-

As indicated in the 1989 Petition for Exemption in that Finance Docket No. 31545, the Guilford merger transactions exacerbated an already anemic traffic and revenue situation for the LVRC and TSRR:

> The LVRC is a shortline railroad which has experienced financial difficulties described at length in the record before the Commission in Guilford Transportation Industries, Inc. -- Control -- Boston and Maine Corporation, 366 I.C.C. 292-372 (December 3, 1982) ("Guilford merger case"). Prior to the mid 1970's it was a bridge carrier owned by the Samuel Pinsly family and operated under the name St. Johnsbury & Lamoille County Railroad Company ("SJ&LC"). After SJ&LC experienced financial difficulties, Pinsly sought and received abandonment authority. The State of Vermont acquired the [LVRC Line] post abandonment and leased it to a succession of shortline operators prior to LVRC's establishment in 1978 as a shipper-owned railroad. After a short period of subsidized operation immediately after startup, the LVRC became marginally profitable due to aggressive marketing as a bridge route. The LVRC experienced financial problems again in the early to mid 1980s due to loss of overhead traffic, which LVRC believes was diverted to competing B&M and MEC routes and deregulation of the railroad industry.
>
> Anticipating the adverse affects of Guilford's control of B&M and MEC LVRC traffic and revenue base, the LVRC challenged that transaction before the Commission and in federal court. In settlement of that litigation, MEC in 1984 transferred to the NVC and LVRC a profitable branch between St. Johnsbury, VT and Whitefield, NH. NVC established TSRR as a new railroad corporation for the purpose of operating this [TSRR Line]. The TSRR has been marginally successful.

As required by the 1984 Settlement, MEC entered into a Lease and Operating Agreement with TSRR dated as of March 1, 1984 (the "TSRR Lease"). A copy of the TSRR Lease is attached hereto as Exhibit A. Reflecting the merits of the challenges raised by LVRC in the Guilford merger cases, the TSRR Lease provides for a long-term lease by TSRR of the TSRR Line, with numerous rights of extension. Section VIII of the TSRR Lease provides for an initial term that ran from March 1, 1984 through December

-4-

31, 1988, and provides TSRR with the right to renew the term for up to a maximum of additional four (4) ten-year periods. Accordingly, the total term of the TSRR Lease is 44 years and ten (10) months, with approximately 26 years remaining in that term.

The current ten (10) year period of the TSRR Lease commenced on January 1, 1999, and ends on December 31, 2008. Again, the TSRR Lease may be further extended by TSRR for two (2) additional ten (10) year terms, through December 31, 2028.

The TSRR Lease also provides expressly that MEC is *exclusively* responsible for marketing rail service to and from the Subject Line. Section IV of the TSRR Lease provides that "MEC shall have and retain the *exclusive* right to deal directly with shippers and receivers regarding traffic moving to or from the Line and to solicit such traffic in the best interest of MEC and the [Guilford system]." (Emphasis added.) MEC has failed miserably in that marketing effort.

The 1984 Settlement and the TSRR Lease also recognized the severe financial and operational difficulties that would be faced on the TSRR Line as a direct consequence of the consolidation of the B&M and MEC under Guilford. The TSRR Lease make expressly clear that TSRR has been and remains obligated only to maintain the TSRR Line, including the Subject Line, and operate the TSRR Line only up to levels that are concordant with the changing traffic demands on the TSRR Line. Section 2.02 of the TSRR Lease provides that "TSRR shall operate the Line and shall provide train service which shall be equal in all respects, including frequency, reliability and speed, to the service presently provided on the Line by MEC *or such other manner of service as may be warranted by traffic levels and operating conditions as they may exist from time*

-5-

*to time.*" (Emphasis added.) Section 2.06 of the TSRR Lease provides that "TSRR shall, at its own expense, maintain the Line in good condition and repair so that freight train operations can be conducted on the Line *as warranted by traffic levels* . . .." (Emphasis added.) Section 1.03 of the TSRR Lease underscores this maintenance standard by permitting TSRR to retire portions of the TSRR Line, including the Subject Line, "which may no longer be required for the performance of the duties of TSRR under this Agreement, and MEC shall not unreasonably withhold approval of such requests." Under the TSRR Lease, TSRR has the express right to retain the proceeds from any such retirements.

Notwithstanding MEC's failure to market rail traffic on the Subject Line, TSRR has performed its operations on the Subject Line, and maintained the Subject Line, as warranted by changing traffic levels as required by the TSRR Lease. Since CSF assumed ownership of the TSRR, the TSRR Line has had only one actual or prospective customer: the paper mill at Gilman, Vermont. And the mill at Gilman has struggled badly over the years. In 1989, the mill was owned by Georgia Pacific, then sold to Simpson Paper Company in the early 1990s. Traffic levels on the line during this period were only in the vicinity of 800 carloads per year. Simpson Paper closed the mill in October 1999. At some later date, the mill was sold to American Tissue Company (aka, The Paper Mill at Gilman, Inc.). No request for rail service on the TSRR Line has been made by the mill since the October 1999 closure.

As further evidence of MEC's failure to meet its marketing obligations on the TSRR Line (including the Subject Line), TSRR would remind the Board that, in 2002,

-6-

MEC sold the eastern portion of the TSRR Line, between the mill at Gilman, Vermont and Whitefield, New Hampshire. See, Finance Docket No. _____, State of New Hampshire, Department of Transportation -- Acquisition and Operation Exemption -- Certain Assets of the Maine Central Railroad Company. Worth noting is that MEC / State of Hampshire transaction included trackage *west* of the switch into the Mill at Gilman, indicating an obvious and deliberate attempt by MEC and the State of New Hampshire to block rail access to the mill at Gilman from Vermont. MEC has also had substantive and numerous discussion with the State of Vermont about a possible sale of the Subject Line, presumably for snowmobile trail purposes. Those discussions can be confirmed by Vermont Agency of Transportation personnel.

In its operations, maintenance, administration and insurance of the Line, TSRR has made substantial investment in the Subject Line. Furthermore, as provided in Section 1.01 of the TSRR Lease, TSRR made a substantial one-time, up-front lease payment of $200,000, which was to cover the *entire* 44 year and ten (10) month term. The only opportunity that remains today to recoup that substantial investment by TSRR is through the abandonment and discontinuance of service over the Subject Line, and through the sale of the rail, ties and other track materials on the Subject Line.

In short, the non-viability of freight rail service on the Subject Line has not had, and does not have, anything to do with the TSRR. That non-viability has been and continues to be a function of the misfortunes of the paper mill at Gilman, Vermont. That non-viability is also directly tied to MEC's flagrant and obvious interest in selling the TSRR Line (including the Subject Line) rather than meeting its contractual obligation

-7-

under the TSRR Lease to market and generate rail traffic on the Subject Line. For these reasons, TSRR seeks to exercise it contractual rights under the TSRR Lease to abandon and discontinue service over the Subject Line, so as to be able to sell and/or salvage the rail, ties and other track materials on the Subject Line.

## COMPLIANCE WITH STB REGULATIONS

In accordance with the regulations of the Surface Transportation Board ("STB" or the "Board"), TSRR hereby submits the following information:

### 1. Exact Name of Applicant; Common Carrier Status -- 49 C.F.R. 1152.22(a)(1)-(2)

TSRR is a Class III common carrier by railroad subject to the jurisdiction of the Board. For a description of the formation and history of the TSRR, please see Finance Docket No. 29772, Guilford Transportation Industries, Inc. -- Control -- Boston and Maine Corporation (Decision served May 22, 1984), pursuant to which common control of LVRC and TSRR by the Northern Vermont Company ("NVC") was exempted from approval by the ICC. TSRR would also direct the Board to Finance Docket No. 31545, Clyde S. and Saundra Forbes and CSF Acquisition, Inc. -- Acquisition of Control -- Northern Vermont Company (Decision served _____, 1989).

-8-

## 2. Relief Sought -- 49 C.F.R. 1152.22(a)(3)

TSRR seeks authority to abandon and discontinue service over the Subject Line so that it may exercise any contractual rights it may have to sell and/or abandon the rails, ties and other materials on the Subject Line.

## 3. Map -- 49 C.F.R. 1152(a)(4)

Attached as Exhibit B to this Petition is a map depicting the Line and its relationship to cities, towns, nearby rail lines and highways.

## 4. Petitioner's Representative -- 49 C.F.R. 1152.22(a)(7)

Any questions concerning this Verified Notice of Exemption should be sent to TSRR's representative at the following address:

> David H. Anderson, Esq.
> Attorney at Law
> 288 Littleton Road, Suite 21
> Westford, MA 01886
> (978) 392-9995

## 5. Zip Codes of the Line -- 49 C.F.R. 1152.22(a)(8)

The Subject Line traverses United States Postal Service ZIP codes 05819, 05824 and 05906.

## 6. Qualification for Class Exemption -- 49 C.F.R. 1152.50(b)

TSRR certifies that no local traffic of any kind has moved over the Subject Line for at least two (2) years, and there is no overhead traffic on the Subject Line. In addition, no formal complaint filed by a user of rail service on the Subject Line (or state or local governmental entity acting on behalf of such user) regarding cessation of service over the Subject Line either is pending with the Board or any U.S. District Court or has

-9-

been decided in favor of such complainant during the last two (2) years. See, Certification of Clyde S. Forbes, attached hereto as Exhibit C.

7. **Proposed Consummation Date – 49 C.F.R. 1152.50(d)(2)**

TSRR intends that the abandonment and discontinuance shall be effective fifty (50) days following the filing of this Verified Notice of Exemption.

8. **Suitability for Other Public Purposes – 49 C.F.R. 1152.22(e)(4)**

TSRR's Environmental and Historic Report in this matter was previously filed with the Board on or about November 7, 2003. A copy of that Report is attached to this Petition as Exhibit D. As indicated in that Report, TSRR believes that the Line may be suitable for conversion to certain public purposes, including recreational uses.

Based on information in TSRR's possession, the Line does not contain federally granted rights-of-way. Any documentation in TSR's possession in this regard will be made available promptly to those requesting it.

9. **Notice Requirements – 49 C.F.R. 1152.50(d)(2), 1105.11 and 1105.12**

A certificate that the agencies designated in 49 C.F.R. 1152.50(d)(1) were served with written pre-filing notice of this abandonment and discontinuance of service is attached hereto as Exhibit E. A certificate that the previously-filed Environmental and Historic Report was served on the agencies designated in 49 C.F.R. 1105.7(b) is attached to that Report. A copy of that Environmental and Historic Report is attached to this Petition as Exhibit D. A certification in accordance with 49 C.F.R. 1105.12 that TSRR has published notice of the proposed abandonment and discontinuance in a newspaper of general circulation in each county through which the Subject Line passes is attached

-10-

hereto as Exhibit F.

### 10. Labor Protection

TSRR understands that, under 49 U.S.C. 10505(g), the Board may not use its exemption authority to relieve a carrier of its statutory obligation to protect employee interests. Accordingly, TSRR anticipates that the Board will impose the employee protective conditions prescribed in Oregon Short Line R. Co. -- Abandonment -- Goshen, 360 I.C.C. 91 (1979). Nevertheless, TSRR does not anticipate that any employees will be adversely impacted by the abandonment.

### 11. Environmental and Historic Report – 49 C.F.R. 1105

Again, the Environmental and Historic Report in this matter was previously filed with the Board on or about November 7, 2003. A copy of that Report is attached to this Verified Notice of Exemption as Exhibit D.

### CONCLUSION

For all the reasons set forth herein, TSRR respectfully provides notice to the Board, pursuant to 49 U.S.C. 10505, regarding the exemption from the prior approval requirements of 49 U.S.C. 10903-10904 with respect to TSRR's abandonment of and discontinuance of service over the Subject Line.

*[Signature Page Follows]*

-11-

Respectfully submitted,

TWIN STATE RAILROAD
COMPANY, INC.

By its Attorney,

Dated: June 1, 2004

David H. Anderson, Esq.
Law Office of David H. Anderson
288 Littleton Road, Suite 21
Westford, MA 01886
(978) 392-9995

## VERIFICATION

Commonwealth of Massachusetts  )
                               ) SS:
Middlesex County               )

Clyde S. Forbes, Jr., being duly sworn, hereby deposes and says that he is the President of the Twin State Railroad Company, Inc., that he has read the foregoing Verified Notice of Exemption, that he knows the facts asserted therein, and that the same are true as stated, to the best of his knowledge, information and belief.

_____
Clyde S. Forbes, Jr.

SUBSCRIBED AND SWORN TO
BEFORE ME THIS 29th DAY OF
MAY, 2004

_____
Notary Public
My Commission Expires: 8/28/09

## CORPORATE DISCLOSURE STATEMENT

Defendant, Maine Central Railroad Company is a wholly-owned subsidiary of Guilford Transportation Industries, Inc. ("Guilford"), which is privately owned and has no parent corporation. Accordingly, no public company owns ten percent (10%) or more of the stock of the Defendant or Guilford.

Dated: December 3, 2004

Respectfully submitted,

*[signature]*

Katherine E. Potter
BBO# 651726
Iron Horse Park
North Billerica, MA 01862
(978) 663-1215
kpotter@guilfordrail.com

*Attorney for Defendant*
*Maine Central Railroad Company*

## CERTIRFICATE OF SERVICE

I hereby certify that true copies of the foregoing documents were served on December 3, 2004, by Federal Express, next day delivery, upon:

Leonard M. Singer, Esq.
Craighead Glick LLP
277 Dartmouth Street
Boston, Massachusetts 02116

Dated: December 3, 2004

_____
Katherine E. Potter