UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| TWIN STATE RAILROAD CORPORATION, Plaintiff | * | |
| v. | * | Civil Action 04-12292 JLT |
| MAINE CENTRAL RAILROAD COMPANY, Defendant | * | |

**OPPOSITION TO MOTION TO DISMISS AND REQUEST FOR HEARING**

Plaintiff Twin State Railroad Corporation ("Twin State") hereby opposes Maine Central Railroad Company's ("Maine Central") Motion to Dismiss. As explained in this opposition the Surface Transportation Board (the "STB") has authorized the abandonment of the railroad line at issue. Under the circumstances, it is appropriate for this Court to decide the contested state law issues arising in connection with the lease between the parties.[1] Whatever applicability Maine Central's arguments concerning federal preemption and primary jurisdiction may have to an active railroad line, they are inapplicable once the STB has authorized abandonment of a railroad line.

I. THE SURFACE TRANSPORTATION BOARD HAS AUTHORIZED ABANDONMENT.

As alleged in the complaint, Twin State applied to the STB for authority, inter alia, to abandon the railroad line at issue. The STB treated that application as an abandonment

[1] Because the parties are of diverse citizenship, this Court has jurisdiction to decide those state law issues.

application and granted it. The decision of the STB (hereinafter the "Decision") is attached to this opposition as Exhibit 1.

In its opposition to Twin State's application, Maine Central argued that Twin State could only seek discontinuance authority, not abandonment authority. (See Decision at page 2)  As the First Circuit explained in *James E. Howard, Trustee, v. Surface Transportation Board*, 389 F.3d 259 (1st Cir. 2004), there is a distinction between abandonment of a rail line and discontinuance of service. Once a carrier abandons a rail line pursuant to authority granted by the STB, the line is no longer part of the national transportation system, and although the Board is empowered to impose conditions on abandonments, as a general proposition STB jurisdiction terminates. In contrast, "discontinuance" authority allows a railroad to cease operating a line for an indefinite period while preserving the rail corridor for possible reactivation of service in the future. *J. Paul Preseault v. Interstate Commerce Commission*, 494 U.S. 1, 5 at n. 3 (1990).

Here, it is clear that the STB understood that Twin State was seeking authority to abandon the line of railroad. In the opening paragraph of the Decision the STB states that Twin State filed "to abandon approximately 20 miles of rail line." Then, after discussing Maine Central's objection, the STB states that Twin State "has sought abandonment authority in this proceeding, [and] the Board has processed [Twin State's] filing as one for authority to abandon the line." Decision at the bottom of page 2.

Furthermore, it is clear that as a matter of federal law Twin State could apply to abandon the line not withstanding that the underlying real estate is owned by Maine Central and Maine Central may have certain common carriers responsibilities with respect to the line. As the First Circuit explained in *Howard v. Surface Transportation Board*, an abandonment application can

be brought to the STB by the rail carrier itself or by a third party. If a third party applies to abandon or discontinue the lines or services of another rail carrier, it is called an "adverse" abandonment or discontinuance. The STB can grant an adverse abandonment or discontinuance on a third party's petition even if the owner of the line or the trackage rights objects. *Thompson v. Texas Mexican Ry. Co., 328 U.S. 134, 145 (1946)*("There is no requirement . . . that the application [for abandonment to the STB] be made by the carrier whose operations are sought to be abandoned.").

The STB, itself, has recognized that an application to abandon may be brought by a third party and may be granted even if the third party objects. *Application of the Chicago and North Western Transportation Company for Abandonment of the Chicago, Rock Island and Pacific Railroad Company Operations Between McClelland and Council Bluffs, Iowa*, 354 I.C.C. 205 (1978); *Salt Lake City Railroad Co., Inc. - Adverse Abandonment - Line of Utah Transit Authority in Salt Lake City, Utah*, AB 520 -0, served September 28, 1999.

The Decision unambiguously grants authority to abandon the line of railroad (subject to the conditions contained in the Decision). As argued in the next section of this Opposition, the STB's grant of abandonment authority clears the way for this Court to adjudicate the controversies between the parties with respect to this line of railroad just as if it were ordinary property and without regard to the restrictions that existed when the line was part of the interstate railroad system.

## II. THIS COURT MAY ADJUDICATE THE CONTROVERSIES BETWEEN THE PARTIES.

Once a line of railroad has been abandoned it is no longer subject to the jurisdiction of the STB. In *Hayfield Northern Railroad Co., Inc. v. Chicago & North Western Transportation Co.*, 467 U.S. 622, 632-33 (1984), a party argued that, even after abandonment, a railroad line remained under the jurisdiction of the STB's predecessor, the Interstate Commerce Commission. The Court said that this argument reflected a misunderstanding of the Interstate Commerce Act: "unless the Commission attaches post abandonment conditions to a certificate of abandonment, the Commission's authorization of an abandonment brings its regulatory mission to an end." As the Seventh Circuit phrased it in *Wisconsin Central Ltd. v. Surface Transportation Board*, 112 F.3d 881 (7th Cir. 1997), once a railroad line has been abandoned, it was "simply ordinary real property that [the owner] was free to transfer or dispose of without Commission approval."

In a case involving Maine Central itself the STB reiterated (1) that it could grant an adverse abandonment application (2) over the objection of the carrier and (3) that its grant of such an application would end its involvement in the railroad line and clear the way for the operation of state law. *Maine Central Railroad Company--abandonment Exemption--in Androscoggin County, ME*, Docket No. AB-83 (Sub-No. 16X) (September 14, 2000). In that case the STB allowed Maine Central to withdraw its own application to abandon a railroad line over the objection of a shipper and the Maine Department of Transportation. The STB went on to point out that its allowing Maine Central to withdraw its application did not leave the third parties without a remedy. The STB pointed out that the shipper or the Maine Department of Transportation could file an application asking the STB "to find that the public convenience and

necessity no longer require the presence of [Maine Central] on the line." The STB went on to say that "[i]f we were to make such a finding, we would withdraw our primary jurisdiction over the line, thereby clearing the way for the operation of state law." To the same effect are *Modern Handcraft, Inc.–Abandonment*, 363 I.C.C. 969, 972 (1981)("we will not allow our jurisdiction to be used to shield a carrier from the legitimate processes of state law while there is no overriding Federal interest to protect"); *Kansas City Pub. Ser. Frgt. Operation Exempt.- Aban.*, 7 I.C.C.2d 216, 224-26 (1990); *Chelsea Property Owners–Aban.–The Consol. R. Corp.*, 8 I.C.C.2d 773, 778 (1992), *aff'd sub nom. Conrail v. ICC*, 29 F.3d 706 (D.C. Cir. 1994).

As the STB explained in *Grand Trunk Western Railroad Incorporated–Adverse Discontinuance of Trackage Rights Application--a Line of Norfolk And Western Railway Company in Cincinnati, Hamilton County, OH*, Docket No. AB-31 (Sub-No. 30) (May 13, 1998):

> the primary question to be resolved is whether there exists sufficient public interest in operation of the subject line to merit continued oversight by the Board. ... The former Interstate Commerce Commission, and now the Board, have determined that a finding of [insufficient public interest] terminates our exclusive and plenary abandonment jurisdiction over the line, enabling interested parties to undertake other legal remedies to effectively remove a carrier from a line.

Similarly in *Salt Lake City Railroad Co., Inc. - Adverse Abandonment - Line of Utah Transit Authority in Salt Lake City, Utah*, AB 520 -0, served September 28, 1999, the Board formulated the issue before it as follows:

> In an application by a third party for a determination that the public convenience and necessity permit a line to be discontinued or abandoned, the issue before the Board is whether the public interest requires that the line in question be retained as part of the

> national rail system. By granting a third party application, the Board withdraws its primary jurisdiction over the line. Questions of the disposition of the line, including the adjudication of claims of ownership or other rights and obligations, are left to state or local authorities.

Maine Central's Motion to Dismiss concedes that a Court is free to deal with a railroad line once the STB grants abandonment authority. Maine Central argues:

> [Twin State] may seek to adversely abandon [Maine Central's] common carrier rights and obligations ... which would remove the jurisdiction of the STB and the preemptive effect of section 10501 (b) thereby allowing [Twin State] to pursue an order declaring the rights of the parties pursuant to the Lease in state or federal court.

That is precisely what has happened. Twin State sought and received an adverse abandonment of the line of railroad after which, in Maine Central's own words, it was free "to pursue an order declaring the rights of parties pursuant to the Lease in state or federal court."

## III. MAINE CENTRAL'S REMAINING RIGHTS, IF ANY, ARE UNDER THE LEASE.

Maine Central suggests that it has (1) the right to prevent Twin State from seeking to abandon the railroad line and (2) the right to provide common carrier services on the railroad line. Twin State disputes that Maine Central has either of those rights and is asking this Court to decide whether or to what extent either of those rights exist. What is important for the pending Motion to Dismiss is that these claimed rights are for decision in this Court and are not matters that the STB can or should decide.

Maine Central argued to the STB that Twin State did not have the right to seek to abandon Maine Central's interest in the railroad line. However, as the cases cited earlier in this memorandum demonstrate, a third party may seek to abandon a railroad line (an adverse abandonment) and the STB may grant such an application over the objection of the carrier. Thus,

to the extent that Maine Central is claiming that Twin State could not seek to abandon Maine Central's interest, it is making a claim that arises out of the dealings between it and Twin State. It is not making a claim under federal law.

The STB acknowledged Maine Central's argument that Twin State did not have the right to abandon the railroad line. It was clear to the STB, however, that Maine Central's argument was grounded in the dealings between the parties. The Decision says that Maine Central's "filing raises a question (not resolved in this decision) about whether [Twin State] has the legal right, *pursuant to its 1984 agreement with [Maine Central]* to abandon and salvage the line." (Emphasis supplied) The STB clearly contemplated that this dispute would be resolved elsewhere as evidenced by its statement that the conditions that it imposed upon abandonment could be removed if Twin State and Maine Central resolved their disagreement concerning their respective legal rights to the line.

Similarly, whatever "rights" Maine Central may have to perform common carrier services on the line arise out of the parties' dealings and not out of federal law. By granting authority to abandon the line, the STB has decided that there is no federal interest in the line, that there is no public need for common carrier services on the railroad line. Maine Central's right is not, therefore, a matter of federal law or anything which the STB can or should concern itself with.

Furthermore, Maine Central has no continuing "obligation" to provide common carrier services on this line. The abandonment of this line pursuant to the authority granted by the STB will terminate any obligation that the Maine Central may have to provide service. *Hayfield Northern Railroad Co., Inc. v. Chicago & North Western Transportation Co.*, 467 U.S. 622, 626 (1984).

Because the issues raised by Maine Central are contractual in nature, they are not to be decided by the STB. The STB has recognized that it does not decide contractual issues relating to an abandoned line. In *Salt Lake City Corporation - Adverse Abandonment is Salt Lake City, Utah*, AB 33 - 83, served August 26, 1999, the Board stated that "this and other contractual disputes appear to be beyond the Board's purview." Similarly in *Kansas City Southern Railway Co. - Adverse Discontinuance* - AB 103 (Sub # 14), served March 20, 1999, the Board "reiterate[d] here, as we have stated in the past, that [we] will not undertake to interpret or enforce operating agreements or contracts."

REQUEST FOR HEARING

Twin State joins in Maine Central's request for a hearing on the Motion to Dismiss.

TWIN STATE RAILROAD
CORPORATION

By its attorneys,

Leonard M. Singer

Leonard M. Singer
BBO No. 464600
Craighead Glick
277 Dartmouth Street
Boston, Massachusetts 02116
(617) 859-8200

CERTIFICATE OF SERVICE

I. Leonard M. Singer, hereby certify that I served the foregoing on all parties. Such service was made by causing a copy of the foregoing to be mailed to Katherine E. Potter Springfield Terminal Railway Company, Iron Horse Park, North Billerica, Massachusetts 01862 December 30, 2004.

Leonard M. Singer

Leonard M. Singer

1

35048
DO

SERVICE DATE – LATE RELEASE OCTOBER 12, 2004

SURFACE TRANSPORTATION BOARD

DECISION

STB Docket No. AB-862X

TWIN STATE RAILROAD COMPANY–ABANDONMENT EXEMPTION–IN CALEDONIA AND ESSEX COUNTIES, VT

Decided: October 12, 2004

Twin State Railroad Company (TSRR) filed a notice of exemption under 49 CFR 1152 Subpart F–Exempt Abandonments to abandon approximately 20 miles of rail line between milepost 0.057 in St. Johnsbury and Railroad Engineering Station 5503 at River Road (Town Road) in Lunenburg (Gilman), in Caledonia and Essex Counties, VT. Notice of the exemption was served and published in the Federal Register on September 3, 2004 (69 FR 53973-74). The exemption was scheduled to become effective on October 6, 2004, but a formal expression of intent to file an offer of financial assistance (OFA) to purchase the line was timely filed by the State of Vermont, Agency of Transportation. The filing of that expression of intent automatically stayed the effective date of the exemption for 10 days until October 16, 2004, to permit the Board to address any OFA filed on or before October 6, 2004. See 49 CFR 1152.27(c)(2)(i). No OFA has been filed.

The Board's Section of Environmental Analysis (SEA) issued an environmental assessment (EA) in this proceeding that was served on September 7, 2004. In the EA, SEA recommended that the following conditions be imposed on any decision granting abandonment authority. First, SEA recommended that, prior to conducting any abandonment and salvaging activities, TSRR be required to consult with the U.S. Army Corps of Engineers - New England District (Corps) on permitting requirements for any abandonment and salvaging activities that may occur within waters of the United States, including, but not limited to, streams, rivers, lakes, and wetlands. Second, SEA recommended that, prior to conducting any abandonment and salvaging activities, TSRR be required to consult with the U.S. Fish and Wildlife Service - Concord, New Hampshire Office (FWS), regarding potential impacts from salvaging activities to threatened species, and report the outcome of these consultations to SEA. Third, SEA recommended that, to protect the line for potential future use or interim recreational use, if salvaging occurs, TSRR be required, during salvage activities, to remove all ties and rails from the right-of-way for proper disposal, reuse or recycling. Fourth, SEA recommended that TSRR be required to notify the U.S. Department of Commerce, National Geodetic Survey (NGS), 90 days prior to salvage activities so that NGS can plan for the potential removal of the 11 identified geodetic station markers on the line that may be affected by the proposed abandonment. Fifth, SEA recommended that TSRR be required to retain its interest in and take no steps to alter the historic integrity of the right-of-way until completion of the section 106 process of the National Historic Preservation Act, 16 U.S.C.

470f (NHPA), so that (a) TSRR may submit additional information to the Vermont Agency for Commerce and Community Development, Division of Historic Preservation (SHPO), and (b) the SHPO may complete its assessment.

Comments to the EA were due by September 21, 2004. FWS contacted SEA by telephone and indicated that it had commented on TSRR's environmental report in November 2003, and requested that its comments be reflected in the environmental documentation for the proposed abandonment. SEA indicates that the FWS comment letter was not referenced in TSRR's notice of exemption and had not otherwise been provided to SEA or brought to SEA's attention by TSRR. FWS's comment letter states that there are no Federally listed or proposed threatened or endangered species or critical habitat under the jurisdiction of FWS known to occur in the projected area. Therefore, FWS concluded that no further consultation under section 7 of the Endangered Species Act would be required for 1 year from November 6, 2003, unless additional information on listed or proposed species becomes available. Accordingly, in recognition of FWS's comments, SEA recommends that the FWS condition recommended in the EA be changed to require instead that, if salvaging activities have not been initiated by November 6, 2004, TSRR shall conduct a follow-up consultation with FWS - New England Field Office, prior to initiating salvaging activities, regarding potential impacts from salvaging activities to threatened and endangered species and TSRR shall report the outcome of these consultations to SEA.

On September 21, 2004, Maine Central Railroad Company (MEC) filed a reply to TSRR's notice of exemption. MEC claims that TSRR's interest in the line is limited to that of a lessee, and that TSRR does not have the right to abandon the line. It states that, when the parties entered into a lease agreement dated March 1, 1984, MEC did not evidence any intent to convey ownership in the line or its common carrier rights and obligations to TSRR or anyone else, and that MEC has not evidenced any such intent throughout the term of the lease. MEC claims that the lease makes clear that it was the intent of both parties that MEC retain ownership interest and common carrier rights and obligations in the line. MEC points out that, rather than discontinuing its leasehold interest, TSRR claims to have the right also to remove the rail, ties, and other track materials. MEC requests that the Board specifically condition any authority granted to TSRR (which MEC argues would be discontinuance and not abandonment authority) by requiring TSRR to leave the line, track, ties and other track materials intact and undisturbed. TSRR has not responded to the MEC submission.

MEC's filing raises a question (not resolved in this decision) about whether TSRR has the legal right, pursuant to its 1984 agreement with MEC, to abandon and salvage the line. TSRR has sought abandonment authority in this proceeding, the Board has processed TSRR's filing as one for authority to abandon the line, and SEA has recommended conditions covering possible abandonment and salvage of the line. In this situation, conditions will be imposed as recommended by SEA that would apply in the event of full abandonment and salvaging of the line. At the same time, in light of the

uncertainty regarding TSRR's right to abandon and salvage the line, the condition requested by MEC that would require TSRR to leave the line, track, ties and other track materials intact and undisturbed, will also be imposed. This condition, imposed in an abundance of caution, may be removed, if appropriate, if TSRR and MEC resolve their apparent disagreement concerning their respective legal rights to the line at issue.

As conditioned, this decision will not significantly affect either the quality of the human environment or the conservation of energy resources.

It is ordered:

1. This proceeding is reopened.

2. Upon reconsideration, the exemption of the abandonment of the line described above is subject to the condition that TSRR shall leave the line, track, ties and other track materials intact and undisturbed. The exemption is also subject to the conditions, in the event that salvaging of the line, track, ties, and other track materials is ultimately permitted to occur, that: (1) prior to conducting any abandonment and salvaging activities, TSRR shall consult with the Corps on permitting requirements for any abandonment and salvaging activities that may occur within waters of the United States, including, but not limited to, streams, rivers, lakes, and wetlands; (2) if salvaging activities have not been initiated by November 6, 2004, TSRR shall conduct a follow-up consultation with FWS - New England Field Office, prior to initiating any salvaging activities, regarding potential impacts from salvaging activities to threatened species, and TSRR shall report the outcome of these consultations to SEA; (3) if salvaging occurs, during any salvage activities, TSRR shall remove all ties and rails from the right-of-way for proper disposal, reuse or recycling; (4) TSRR shall notify NGS 90 days prior to salvage activities so that NGS can plan for removal of the 11 geodetic station markers identified on the line; and (5) TSRR shall retain its interest in and take no steps to alter the historic integrity of the right-of-way until completion of the section 106 process of the NHPA.

3. This decision is effective on its service date.

By the Board, David M. Konschnik, Director, Office of Proceedings.

Vernon A. Williams
Secretary